IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL D. ALESHIRE,

      Plaintiff,

v.                                    CASE NO. 2:05-cv-00168

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the court on cross-motions for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Micheal D. Aleshire (hereinafter referred to as "Claimant"), filed an application for DIB on July 18, 2000, alleging disability as of January 22, 2000. (Tr. at 68-71.) The claim was denied initially and upon reconsideration. (Tr. at 50-54, 56-58.) Following an administrative hearing, an Administrative Law Judge ("ALJ") denied Claimant's application for benefits on September 25, 2001. (Tr. at 21-28.) Following denial of review by the Appeals Council, Claimant appealed to federal court and on

September 22, 2003, the undersigned reversed and remanded the matter for further administrative proceedings. (Tr. at 397-406.)

On December 10, 2001, while the ALJ's decision on the July 2000, application was pending review, Plaintiff protectively filed a new DIB application. (Tr. at 445-48.) This application was denied initially and upon reconsideration. (Tr. at 381-82.) By decision dated May 13, 2003, the ALJ granted Claimant's application for a period of disability beginning on the amended onset date of September 26, 2001. (Tr. at 388-92.)

On October 17, 2003, the Appeals Council reversed the ALJ's decision granting benefits on the December, 2001, application and remanded the ALJ's decision. (Tr. at 407-12.) Thereafter, the Appeals Council ordered that the December 2001, application and the July 2000, application, which decision had been reversed and remanded by the undersigned, be consolidated. (Tr. at 413.) An administrative hearing was held on May 7, 2004, before the Honorable Theodore Burock. (Tr. at 819-48.) By decision dated December 21, 2004, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 309-30.) The Appeals Council denied Claimant's request for review. On February 23, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483

2

F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2004).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the

claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2004).  The Commissioner must show two things:  (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 311.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of left knee syndrome, right knee syndrome, a low back syndrome, a depressive disorder and borderline intellectual functioning.  (Tr. at 311.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 311.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 312.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 328.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as surveillance system monitor and packer (small merchandise), which exist in

4

significant numbers in the national economy.  (Tr. at 328.)  On this basis, benefits were denied.  (Tr. at 329.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

 Claimant was thirty-three years old at the time of the most recent administrative hearing. (Tr. at 829.) Claimant completed the seventh grade. (Tr. at 830.) In the past, he worked as a coal miner. (Tr. at 843.)

The Medical Record

 The court has reviewed all medical evidence of record and will summarize chronologically the evidence of record related to Claimant's knee impairments.

July 8, 1997 - right knee - prior to his onset on January 22, 2000, Claimant underwent an arthroscopic partial medial meniscectomy by D. Raja, M.D. (Tr. at 148-49);

January 26, 2000 - left knee - following an injury at work, Claimant underwent arthroscopic examination of the left knee, arthroscopic partial medial meniscectomy, posterior horn area, removing more than 2/5 volume of the meniscus and partial lateral meniscectomy removing about 30 percent of the meniscus, chondroplasty patella by R. Padmanaban, M.D. (Tr. at 185-86);

June 13, 2000 - left knee - Claimant continued to have persistent pain and swelling since his January surgery with intermittent catching and popping but no actual locking of the knee and, as a result, underwent diagnostic and surgical arthroscopy, left knee, with partial medial meniscectomy by J. Cox, D.O. (Tr. at 206-07);

June 28, 2000- October 25, 2000 - Dr. Cox's treatment notes reveal

6

the following:

June 28, 2000 - after Claimant's June 13, 2000, surgery he had quite a bit of swelling and while out of town, had to go to the emergency room due to swelling; Claimant was intact neurovascularly, and the range of motion in the knee was 5-90 degrees; Claimant complained of right knee pain due to increased pressure from shifting his weight away from his left knee (Tr. at 220);

July 26, 2000 - Claimant had pain and popping in his right knee and inability to fully extend in the left knee; Claimant had mild swelling of the left knee, full flexion and about a five degree extension lag; his right knee showed medial retinacular tenderness, mild patellar crepitus with range of motion and pain with patellar compression; McMurray's and Lachman's tests were negative (Tr. at 219);

August 23, 2000 - Dr. Cox noted Claimant had done well regarding his left knee impairment with the exception of stiffness in the knees; Claimant still could not fully extend his knee despite aggressive physical therapy; Dr. Cox prescribed a turn-buckle style brace for the left knee for gradual forced extension; regarding his right knee, Dr. Cox noted Claimant had a strain and chondromalacia (Tr. at 218);

September 25, 2000 - Dr. Cox noted some progress in Claimant's left knee range of motion; Claimant was extending to 18 degrees

from 25 degrees initially (Tr. at 217);

October 25, 2000 - Dr. Cox noted that Claimant had drastically improved, but had reinjured his left knee when his knee gave out on him while walking in his yard; Dr. Cox diagnosed a torn medial meniscus of the left knee, status post arthroscopic partial medial meniscectomy, possibly a new tear with this new injury and arthrofibrosis (Tr. at 587);

November 21, 2000 - left knee - Claimant underwent diagnostic and surgical arthroscopy, left knee, with partial medial meniscectomy and manipulation of the left knee by Dr. Cox (Tr. at 256-58);

December 18, 2000 - January 15, 2001 - Dr. Cox's treatment notes reveal the following:

December 18, 2000 - Dr. Cox noted that Claimant still had significant weakness in his quads, though range of motion had improved (Tr. at 582);

January 15, 2001 - Dr. Cox noted Claimant had reinjured his left knee in a direct fall and that Claimant had mild bruising and swelling over the prepatellar bursa, but no frank effusion and good range of motion; Claimant had tenderness over the medial joint line; Dr. Cox continued physical therapy and ordered a functional capacity evaluation in a few weeks (Tr. at 580);

February 1, 2001 - on a functional capacity evaluation, Claimant was able to work at the sedentary-light physical demand level and demonstrated no symptom/disability exaggeration behavior (Tr. at

625);

February 9, 2001 – July 5, 2001 – Dr. Cox's treatment notes reveal
the following:

February 9, 2001 – Dr. Cox noted the results of Claimant's
functional capacity evaluation; Claimant had medial joint line
tenderness, full range of motion and no obvious instability; his
impression was torn medial meniscus, recurrent, left knee at
maximum medical improvement; Dr. Cox recommended vocational
rehabilitation (Tr. at 578);

March 30, 2001 – Dr. Cox noted that Claimant could not return
to his previous job (Tr. at 576);

April 30, 2001 – Claimant's condition was unchanged; Dr. Cox
noted the results of Claimant's MRI on the right knee, which
revealed a complete absence of the posterior horn of the medial
meniscus, presumably postsurgical in nature, there were minimal
articular surface changes at this point; Dr. Cox also recommended
a long-term pain management referral (Tr. at 572);

July 5, 2001 – Claimant reported continued pain in his right
knee, especially after walking for a while; Claimant's left knee
pain was anteriorly and inferiorly around the knee cap, although it
was somewhat improved; Claimant's right knee still showed
tenderness on the medial joint line with no instability; Dr. Cox
recommended arthroscopic surgery on the right knee (Tr. at 570);

July 31, 2001 – right knee – Claimant underwent diagnostic and

surgical arthroscopy on the right knee with a chondroplasty medial femoral condyle by Dr. Cox (Tr. at 272-73);

September 5, 2001 - Dr. Cox completed an assessment on September 5, 2001, on which he opined that Claimant could lift twenty pounds occasionally, sit six hours in an eight-hour day for two hours without breaks, stand for four hours in an eight-hour day for one hour without breaks, no standing on hard surfaces, no walking on uneven ground, never climb, kneel or crawl and only occasionally balance, stoop and crouch, that Claimant should not push or pull with his feet or legs and that he should avoid heights and vibration (Tr. at 265-66);

October 8, 2001 - Dr. Cox noted in a treatment note that Claimant was doing much better with his right knee; Claimant's main complaint was in his left knee, where he complained of grinding and pain after walking long distances, with stair climbing and kneeling; Dr. Cox recommended arthroscopic patella chondroplasty on the left knee (Tr. at 561);

November 15, 2001 - left knee - Claimant underwent diagnostic and surgical arthroscopy of the left knee with laser patellar chondroplasty by Dr. Cox, who noted conservative treatment had failed and Claimant's activities had been curtailed (Tr. at 547-48);

December 17, 2001 - February 13, 2002 - Dr. Cox's treatment notes reveal the following:

10

December 17, 2001 - Four weeks after surgery, Claimant reported he was "110% better"; Claimant had about 30 degrees of flexion, anteriorly, no crepitus, no effusion and full range of motion; Dr. Cox instructed Claimant to continue occupational rehabilitation (Tr. at 558);

January 16, 2002 - Claimant reported doing better with his left knee, though his goals had not quite been met in the areas of strength and range of motion; on examination Claimant still had medial joint line tenderness, "really" full range of motion and mild thigh atrophy (Tr. at 557);

February 13, 2002 - Claimant reported doing better with both knees; Claimant still had some pain and popping over the medial side of his left knee around the pes anserine tendon insertion; he had mild swelling and tenderness here but no instability in his left knee at all; Claimant had some very mild patellar crepitus on the right side without pain or swelling; neurovascular status was intact bilaterally with no frank effusion; Claimant complained of low back pain and on examination had paravertebral tenderness and spasm at the lumbosacral junction on the right side more than the left, there was no evidence of radiculopathy; Dr. Cox stated he would send Claimant for work conditioning and hardening but that if they could not get him to his minimum safety level for his job requirements, he would strongly have to consider a job retraining program (Tr. at 706);

11

February 25, 2002 - a State agency medical source opined that Claimant could perform light level work, reduced by occasional postural limitations and a need to avoid moderate exposure to vibration and concentrated exposure to extreme cold and hazards (Tr. at 640-48);

June 26, 2002 - Claimant reported to Dr. Cox that his bilateral knee impairment was unchanged; Claimant had extremely painful swelling in the right great toe, MTP joint for about a week; Claimant had swelling over the MTP joint, but Claimant reported it was improved; Claimant's knee examination was unchanged; Dr. Cox opined that Claimant was at maximum medical improvement with both knees and that he was unable to perform his preinjury work duties (Tr. at 705);

September 23, 2002 - Dr. Cox noted that Claimant's MRI of the lumbar spine was negative; Claimant continued to have left knee pain, more so on the medial joint line; x-rays of the left knee showed mild joint space narrowing and subchondral sclerosis medially; Dr. Cox administered a cortisone injection; Claimant had full range of motion, crepitation with range of motion, but no effusion; Claimant was tender in the medial joint line, but the ligaments were stable; Dr. Cox diagnosed osteoarthritis of the left knee (Tr. at 704);

October 16, 2002 - Stephen Nutter, M.D. examined Claimant at the request of the State disability determination service and diagnosed

12

knee pain with posttraumatic and degenerative arthritis and back pain with chronic lumbosacral strain; Claimant ambulated with a normal gait and did not require the use of a handheld assistive device; Claimant appeared stable at station and comfortable in the supine and sitting positions; Claimant had tenderness in the left knee and pain in the right knee, somewhat reduced range of motion due to pain and laxity in the knees; Claimant had giveaway weakness in the knees that could only be rated 4/5 due to giveaway weakness from pain (Tr. at 678-80);

October 31, 2002 - a State agency medical source opined that Claimant could perform light level work, reduced by occasional postural limitations (Tr. at 684-91);

November 11, 2002 - Dr. Cox noted that Claimant continued to complain of left knee pain and persistent spasm and pain along the lumbosacral spine; neurovascular status was intact, the knees showed no effusion or ligamentous laxity; there was full range of motion in the knees, but definite joint line tenderness over the medial side; Claimant had mild atrophy around the quads and VMO on the left side; Dr. Cox recommended an RS-4I electrical muscle stimulator to relieve pain and decrease muscle atrophy; Dr. Cox increased Claimant's Vioxx prescription (Tr. at 703);

February 14, 2003 - Dr. Cox completed a second assessment and opined that Claimant could lift twenty pounds occasionally, sit for three hours without a break, stand or walk for one hour without a

break, sit for a total of four hours in an eight-hour day, stand or walk for a total of two hours in an eight-hour day, avoid standing on hard surfaces or standing and walking on uneven ground, never climb, kneel and crawl, occasionally balance, stoop and crouch, no pushing or pulling with the feet and legs and that Claimant cannot work a full eight-hour day (Tr. at 721-22);

March 19, 2003 - Dr. Cox noted that Claimant was doing better with his left knee after using the RS4 muscle stimulator; Claimant reported his knee was much stronger and more stable; Claimant's quadriceps tone and size was almost equal to the right side, which was a dramatic improvement; Claimant had full range of motion and minimal medial joint line tenderness; Claimant had mild crepitus and no gross instability (Tr. at 727);

April 30, 2003 - Dr. Cox noted that Claimant was doing a little better with his left knee and low back; Claimant had tenderness over the pes anserine bursa on the left knee; full range of motion; no instability (Tr. at 726);

May 13, 2003 - Christopher Kim examined Claimant on May 13, 2003, and diagnosed chronic low back pain, most likely due to sacroiliac joint arthropathy, possibly due to antalgic gait and poor balance and walking habits and probably secondary to bilateral knee pain; he recommended sacroiliac joint injections (Tr. at 741);

July 14, 2003 - Claimant reported to Dr. Cox that his left knee "feels pretty good," though he still had some tenderness over the

14

pes anserine bursitis; the left knee had full range of motion; no crepitus with range of motion; no effusion or swelling; mild tenderness of the pes anserine bursa; ligaments were stable; neurovascularly intact (Tr. at 725);

August 25, 2003 - Dr. Cox noted that Claimant was "still doing good with his knees;" Claimant was having "a little bit" of pain in the back of his left knee, but he had been more active recently; Claimant had full range of motion in the knees, no effusion, Claimant had swelling and mild tenderness over the pes anserine bursa, especially on the left side; Claimant was neurovascularly intact; Dr. Cox's impression was a torn lateral meniscus, bilateral knees, with mild pes anserine bursitis and lumbosacral strain with sciatica (Tr. at 724);

October 10, 2003 - Dr. Cox noted that Claimant reported increased pain over the medial part of the left knee; the examination remained unchanged; Dr. Cox told Claimant to start using his knee brace again and to engage in no "running, jumping, or activities which require starting, stopping and pivoting, for the next four weeks" (Tr. at 780);

November 24, 2003 - Chris Santangelo, PAC of Dr. Cox's office noted Claimant reported his left knee felt about the same; Claimant had full range of motion in the left knee, no instability, mild swelling over the pes anserine bursa with tenderness; Claimant had a negative McMurray's and ligaments were stable; Claimant was

15

neurovascularly intact; Mr. Santangelo ordered a functional capacity evaluation followed by work hardening (Tr. at 779);

January 19, 2004 - Mr. Santangelo noted that Dr. Kim had administered epidural injections, which helped for three to four days; Dr. Cox decided to hold off on a functional capacity evaluation until Claimant's back pain was resolved (Tr. at 778);

March 1, 2004 - Dr. Cox noted a little bit of weakness and buckling of the left knee occasionally, but not much pain; on examination Claimant had "some definite atrophy of the vastus medialis obliquus muscle over the left knee"; the remainder of Claimant's quads were strong; Claimant had full range of motion; Claimant had no ligamentous instability; Dr. Cox's impression was left knee medial meniscus tear status point resection, bilateral knee pes anserine bursitis and sciatica (Tr. at 777);

May 11, 2004 - Paul Bachwitt, M.D. examined Claimant in connection with his workers' compensation claim; Claimant was unable to stand unassisted and used a cane; Claimant had an antalgic lean; in the right knee, Claimant had full extension with flexion to 112 degrees, no effusion, mild crepitus over the patella, Claimant complained of medial joint line tenderness in the right knee but had no lateral joint line tenderness; in the left knee, Claimant lacked 25 degrees of full extension with flexion to 65 degrees, no effusion was present, moderate crepitus was noted over the patella, Apley's grinding test elicited pain at the medial joint line,

16

Claimant had marked limitation of motion in the left knee; Dr.
Bachwitt opined that Claimant had not reached maximum medical
improvement; Dr. Bachwitt felt Claimant needed to strengthen the
left knee and regain motion (Tr. at 785-93)

July 28, 2004 - Dr. Cox noted Claimant's condition was unchanged
related to his knee and low back, but that Claimant had significant
testicular pain and swelling; Dr. Cox was concerned that this may
be a radicular finding; Claimant had full range of motion in the
knee, and noted this was contrary to Dr. Bachwitt's recent finding;
Claimant had some atrophy of the quadriceps; Dr. Cox recommended a
rehabilitation program (Tr. at 795);

September 15, 2004 - Dr. Cox responded to a request from counsel to
explain the difference in his February 14, 2003, and September 5,
2001, assessments; Dr. Cox explained that on September 5, 2001,
Claimant was recently status post arthroscopy of the right knee
with chondroplasty of the medial femoral condyle, and he was
progressing as expected but in the ensuing months "it became clear
that he was going to be one of the unfortunate minority of patients
who, despite aggressive chondroplasty, fail to progress as
expected" and "[a]s of February 14, 2003, he was still having right
knee pain causing significant disability which prompted us to
essentially take a step backwards and get more aggressive with his
restrictions and his treatment" (Tr. at 794).

17

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in ignoring the opinion of Claimant's treating physician, Dr. Cox; and (2) the simple chronology of the medical evidence establishes disability on its face. (Pl.'s Br. at 4-17.)

The Commissioner argues that (1) the treatment history set forth in Claimant's argument does not contradict the ALJ's findings; (2) substantial evidence supports the ALJ's rejection of Claimant's treating physician opinion rendered in February of 2003; and (3) substantial evidence supports the ALJ's conclusion that Claimant was not disabled. (Def.'s Br. at 5-11.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2) (2004). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility

18

for benefits.  20 C.F.R. § 404.1527(d)(2) (2004).  Ultimately, it
is the responsibility of the Commissioner, not the court to review
the case, make findings of fact, and resolve conflicts of evidence.
Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted
above, however, the court must not abdicate its duty to scrutinize
the record as a whole to determine whether the Commissioner's
conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397
(4th Cir. 1994).

     The court finds that the ALJ adequately weighed the evidence
of record from Dr. Cox, and the ALJ's findings, including the
ultimate determination that Claimant is not disabled, are supported
by substantial evidence.  In his decision, the ALJ explained that
he rejected the second assessment by Dr. Cox in February of 2003,
when Dr. Cox opined that Claimant could not work a full eight-hour
day.  The ALJ explained that Dr. Cox's

> assessment [is] inherently inconsistent (c.f. Exhibits
> 23F and B22F).  The total amount of time that the
> claimant could sit without a break increased from two
> hours to three hours, which suggests a greater capacity
> for maintaining sitting.  Although the total amount of
> time that the claimant could stand or walk during the day
> decreased from four to two hours, the length of time that
> the claimant could stand or walk without interruption
> remained the same, one hour, which does not suggest a
> decreased capacity to maintain standing or walking.  The
> changes in the assessment of the total times that the
> claimant could perform these activities during an
> ordinary workday appear to have been determined by the
> need to have an outcome that supported the doctor's
> opinion: The second physical capacity assessment form
> contained a new, final question, Based on your patient's
> physical limitations, do you feel that he can work a full
> eight hour day?  Dr. Cox indicated, No.

(Tr. at 320-21.)

The ALJ further explained that

Dr. Cox is a board-certified orthopedic surgeon.  He has followed the claimant for his knee conditions for over four years, and as his authorized Workers' Compensation doctor, Dr. Cox is cognizant of other impairments which might contribute to the claimant's physical limitations. When questioned regarding the difference in the restrictions in the two assessments, Dr. Cox cited failure of the claimant's right knee to progress as expected after September 2001, requiring more aggressive treatment (Exhibit B32F).  Dr. Cox's treatment record shows, to the contrary, continued improvement in the claimant's right knee condition.  The treatment record does not reflect more aggressive treatment.  The claimant has consistently been prescribed physical therapy and medication, primarily nonsteroidal anti-inflammatory drugs and occasionally narcotic analgesics.  The doctor's focus on the right knee, when the left knee has been more symptomatic, suggests a lack of attention to the second physical capacity assessment.

Regardless of its locus, Dr. Cox cited pain that caused "significant disability."  The doctor's clinical findings and laboratory reports do not support disabling pain in the claimant's knees or his back.  The level of intensity of treatment does not support disabling pain.  In a recent report of medications, the claimant indicated that he had been on Darvocet since January 2002, contrary to his earlier report, in which he acknowledged that he was prescribed Darvocet in January 2003 (c.f. Exhibits B7E and B11E).  In May 2003 another physician who was treating the claimant for his back condition advised the claimant to stay on Darvocet, which Dr. Cox was prescribing, for his back pain (Exhibits B24F, p. 7, and B1F, p. 4).  However, Dr. Cox's treatment record shows that the claimant is currently being maintained on a nonsteroidal anti-inflammatory drug (Relafen) for his knees (Exhibit B32F, p, 2).

(Tr. at 321.)

Dr. Cox's September 15, 2004, letter in which he explains why

he found more severe limitations on the second assessment dated

February 14, 2003, is puzzling.  Dr. Cox stated in his letter that

> [o]n September 5, 2001 [the date of the first assessment,
> Claimant] was recently status post arthroscopy right knee
> with chondroplasty of the medial femoral condyle.  He was
> progressing as expected and typically he would have been
> at that time 6-8 weeks from maximum medical improvement
> with a very reasonable prognosis.  However, in the
> ensuing months it became clear that he was going to be
> one of the unfortunate minority of patients who, despite
> aggressive chondroplasty, fail to progress as expected.
>
> As of February 14, 2003 he was still having right knee
> pain causing significant disability which prompted us to
> essentially take a step backwards and get more aggressive
> with his restrictions and his treatment.  I believe my
> provided office notes will provide the necessary detail
> here.

(Tr. at 794.)

Dr. Cox's observations about Claimant's right knee are not consistent with the treatment notes.  Claimant underwent the second right knee surgery in July of 2001, just before Dr. Cox completed the first assessment on September 5, 2001.  However, on October 8, 2001, Dr. Cox noted Claimant's right knee was much better, and that his main complaint was the left knee.  (Tr. at 561.)  There is little specific mention of the right knee after this.  On February 13, 2002, Claimant reported doing much better with both knees.  Dr. Cox noted Claimant had some mild patellar crepitus on the right side without pain or swelling.  (Tr. at 706.)  On June 26, 2002, Dr. Cox noted that Claimant was at maximum medical improvement with both knees and on November 11, 2002, he noted that Claimant had full range of motion in both knees.  (Tr. at 705.)  Dr. Cox's statements that Claimant encountered significant problems related

21

to the right knee in the ensuing months after the first assessment in September of 2001 and that as of February 14, 2003, he was still having right knee pain causing significant disability simply are not supported by Dr. Cox's underlying treatment notes.

Dr. Cox's limitations on the second assessment dated February 14, 2003, are not otherwise supported by substantial evidence, including Dr. Cox's treatment notes.  As the ALJ observed, Dr. Cox's second assessment appears to be result oriented.  Dr. Cox's treatment notes cited above and dated after the first assessment in September of 2001, do not indicate a worsening in Claimant's knee conditions that would have resulted in Claimant's inability to work a full eight-hour day.  The treatment notes indicate Claimant continued to have problems with his left knee and eventually, developed a back impairment as well.  However, Dr. Cox's objective findings related to these impairments do not support a finding of total disability.  Clearly, Claimant, who was just thirty-three years old at the time of the administrative hearing, suffers from significant knee and back impairments.  The ALJ's residual functional capacity finding of sedentary work, reduced by nonexertional limitations, adequately contemplates Claimant's limitations related to these and other impairments.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this

22

day, the Plaintiff's Motion for Judgment on the Pleadings is DENIED, Defendant's Motion for Judgment on the Pleadings is GRANTED, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to provide copies of this Order to all counsel of record.

ENTER: March 29, 2006

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL D. ALESHIRE,

       Plaintiff,

v.                          CIVIL ACTION NO. 2:05-cv-00168

JO ANNE BARNHART,
Commissioner of Social Security,

       Defendant.

## J U D G M E N T   O R D E R

In accordance with the MEMORANDUM OPINION entered this day, it is hereby **ORDERED** as follows:

(1) Plaintiff's Motion for Judgment on the Pleadings is **DENIED**; and

(2) Defendant's Motion for Judgment on the Pleadings is **GRANTED**; and

(3)  The final decision of the Commissioner is **AFFIRMED**; and

(4)  This action is **DISMISSED** from the docket of this court.

The Clerk is directed to provide copies of this Order to all counsel of record.

      **ENTER**: March 29, 2006

                                      Mary E. Stanley
                                      United States Magistrate Judge